IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| APOGEE COAL COMPANY, A.T. MASSEY COAL COMPANY, INC., BETHENERGY MINES, INC., CONSOLIDATION COAL COMPANY, DRUM-MOND COMPANY, INC., EASTERN ASSOCIATED COAL CORP., HOBET MINING, INC., JIM WALTER RESOURCES, INC., LTV STEEL COMPANY, INC., PEABODY COAL COMPANY, U.S. STEEL MINING COMPANY, L.L.C., and CENTRAL OHIO COAL COMPANY,<br><br>                Plaintiffs<br><br>vs.<br><br>MICHAEL H. HOLLAND, ELLIOT A. SEGAL, WILLIAM P. HOBGOOD, MARTY D. HUDSON, THOMAS O.S. RAND, CARL E. VAN HORN, GAIL R. WILENSKY, as Trustees of the United Mine Workers of America Combined Benefit Fund; and BRUCE BABBITT, Secretary of the Department of the Interior,<br><br>                Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action Number<br>)<br>)  98-C-2858-S<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This case implicates *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S. Ct. 2131 (1998), in which the Supreme Court invalidated certain sections of the Coal Industry Retiree Health Benefit Act[1] ("the Coal Act" or "the Act"). Those sections authorized the

---

[1] The Coal Act has been codified as part of the Internal Revenue Code at 26 U.S.C. §§ 9701-22.

1

Commissioner of the Social Security Administration ("SSA") to assign premium responsibility for beneficiaries of the United Mine Workers of America ("UMWA") Combined Benefit Fund ("CBF") to companies that did not sign a 1974 or later coal wage agreement. The instant action was filed by twelve coal operators against the Trustees of the CBF, challenging premium assessments contained in billing statements sent to the Plaintiffs on October 28, 1998, covering the period October 1, 1998 - September 30, 1999, and adjustments of Plaintiffs' premium liability for prior years.

The parties have filed cross-motions for summary judgment.

Based on the undisputed facts, the Court concludes that Defendant Trustees did not violate the Coal Act when they adjusted larger portions of the 1950 Pension Plan transfers to offset the larger unassigned beneficiaries premiums resulting from the *Eastern Enterprises* decision. Accordingly, they are entitled to a judgment in their favor.

## I.

Congress passed the Coal Act in an effort to stabilize funding and provide health care benefits to retired miners and their families. The Coal Act merges the 1950 and 1974 National Bituminous Coal Wage Agreements ("NBCWA") into a new fund called the UMWA Combined Benefit Fund. The CBF is funded by premiums assessed against coal operators who signed any NBCWA or other agreement requiring contributions to the 1950 and 1974 Benefit Plans. Essentially, it provides the same benefits to "eligible beneficiaries," i.e., retired coal miners and their dependents, as the 1950 NBCWA and 1974 NBCWA. A seven-member board of trustees ("Defendants" or "the Trustees")

administers the CBF. 26 U.S.C. §9702(b).

The Coal Act obligates coal operators to pay premiums to fund the CBF.

### Beneficiary Assignment Process

The Act directs the SSA to assign coal industry retirees to coal operators who formerly employed them in accordance with a three-tier preference system. 26 U.S.C. § 9706(a). First, the Social Security Administration ("SSA") is required to assign retirees to the coal operator signatory to the 1978 or subsequent NBCWA who was the most recent signatory operator to employ the retiree in the coal industry for at least two years. *Id.* at §9706(a)(1). Second, if no such operator can be identified, the SSA must assign the retiree to the most recent signatory to the 1978 or a subsequent NBCWA to employ the retiree in the coal industry for any period of time. *Id.* at § 9706(a)(2). Finally, if no 1978 or later signatory employer (or related person) remains in business, the third and final assignment preference is the retiree's signatory employer in the coal industry for the longest period of time prior to the effective date of the 1978 NBCWA. *Id.* at § 9706(a)(3). Any eligible miner who cannot be assigned under this three-tier system is considered an unassigned beneficiary or orphan.

After receiving notice of an assignment, an employer operator may request the SSA to review the assignment. 26 U.S.C. § 9706(f)(1). If the SSA finds the assignment to be erroneous, both the Trustee and the operator are notified. The SSA then disassigns the beneficiary from that operator. The Trustees must modify the operator's premium obligations to account for the assignment change. *Id.* at § 9706(f)(3(A)(i). The operator

3

is refunded for any previously paid obligations and the SSA will then reassign the retiree to another a new operator if one can be identified. If a new operator cannot be identified, then the beneficiary is considered as unassigned.

The Trustees then recalculate each assigned operator's premium liability from February 1993, the start of the first plan year. This process is known as "inception-to-date billing" or "inception billing." Because the computation of premiums is based on the number of assigned and unassigned beneficiaries for each plan year, when the SSA changes a beneficiary's assignment status, the affected operators' premiums correspondingly must be changed.

Assigned Operators' Premium Obligations

Each assigned coal operator has an annual obligation composed of a health benefit premium, a death benefit premium, and an unassigned beneficiary premium. 26 U.S.C. § 9704(a)(1)-(3). The health benefit premium varies directly with the total number of beneficiaries assigned to that operator. The death benefit premium finances death benefits paid to all (both assigned and unassigned) eligible beneficiaries. The unassigned beneficiaries premium finances the health care for all the unassigned beneficiaries. Each operator's share of that the unassigned premium is based on the ratio of that operator's assignments to the total number of assigned beneficiaries.

Each fall, after receiving an electronic file containing the assignment status of all mineworkers eligible to receive retirement benefits from the SSA, the Trustees must transmit to each assigned operator a bill stating the operator's premium obligations for

the upcoming year. 26 U.S.C. §§ 9703(f); 9704(a). Using inception billing, the statement also includes a restatement of the operator's premium obligations for each prior plan year.

## The Coal Act's Funding

To assist in the reduction of the operators' premium obligations, the Coal Act directed the transfer of monies to the CBF from two sources.

The first of these sources is the 1950 UMWA Pension Plan. Congress directed the Trustees to transfer $210 million in three payments of $70 million each from the 1950 UMWA Pension Plan. 26 U.S.C. § 9705(a). The first transfer, made on February 1, 1993, was "used to reduce operators' premium obligations for the 1993 plan year, consisting of health benefit, death benefit, and unassigned beneficiary premiums." 26 U.S.C. §9705(a)(3)(A). This payment sufficiently covered all of the unassigned beneficiaries' health care premiums and death benefits premiums for all beneficiaries. The remaining amount was used to partially reduce the assigned beneficiaries premiums.

A second transfer of $70 million was made on October 1, 1993, for plan year 1994, and a third transfer of like amount was made on October 1, 1994. For each of the three years, the Coal Act required that the premium for the unassigned beneficiaries be paid ahead of death premiums. However, the remainder of the second and third transfers could not be used to reduce the assigned beneficiaries premiums; instead, the remainder was to be used to offset assigned operators' future death benefit premiums. 26 U.S.C. § 9705(a)(3)(B).

The second source of transfer funds was the Abandoned Mine Land Reclamation Fund ("AML Fund"). Beginning with plan year 1996, the unassigned beneficiaries account was funded with the interest earned on the corpus of the AML Fund pursuant to § 402 of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA") managed by the Department of the Interior. 26 U.S.C. § 9705(b); 30 U.S.C. § 1232(h). However, amounts from the AML Fund may not exceed "the amount of expenditures which the Trustees of the Combined fund will be debited against the unassigned beneficiaries premium account." 30 U.S.C. § 1232 (h)(3)(A). Indeed, the Coal Act specifically provides:

> [a]ny amount transferred [from the AML Fund] for any fiscal year shall be used to proportionately reduce the unassigned beneficiary premium under section 9704(a)(3) of each assigned operator for the plan year in which transferred.

26 U.S.C. § 9705(b)(2). Interest on the AML Fund's sufficiently covered plan years 1996, 1997, and 1998.

Congress specified that amounts transferred from the 1950 Pension Plan may only be used to reduce obligations for the 1993, 1994, and 1995 plan years. 26 U.S.C. § 9705(a)(3). Likewise, the monies transferred from the AML Fund may only be used to reduce obligations for the 1996 and subsequent plan years.

The <u>Eastern Enterprises</u> Decision And Its Impact

In June 1998, the Supreme Court addressed the constitutionality of the third tier of the Coal Act's assignment preference system. In a plurality opinion, the Court held

unconstitutional as applied to former coal operator Eastern Enterprises ("Eastern"), the requirement that Eastern fund health benefits for retired miners who had worked for that operator simply by virtue of its status as the pre-1974 signatory operator who had employed miners for the longest period of time. In the Court's view, that provision violated the Fifth Amendment's Takings Clause. *Eastern Enters.*, 524 U.S. at 503.

In September 1998, the SSA voided all beneficiary assignments previously made to Eastern Enterprises and more than 100 other similarly situated companies ("the reach backs"). This resulted in 8,119 beneficiaries, who had been assigned at the start of the 1998 plan year, being redesignated as unassigned beneficiaries for all plan years.

Upon receipt of the electronic file, the Trustees returned all premiums to operators who has been relieved of their assigned beneficiaries as result of *Eastern Enterprises*. They also began preparing billing statements for the 1999 plan year. Consistent with their prior practice, the Trustees used the inception billing process to account for the assignment changes made by the SSA. They recalculated health benefit premiums and unassigned beneficiaries premiums for the 1993 plan year and each subsequent plan year.

The shift of thousands of assigned beneficiaries to unassigned beneficiary status resulted in significant changes in the remaining operators' premium obligations. For the first time, the Trustees assessed a death benefit premium for plan year 1999, and retroactive death benefit premiums for plan years 1997 and 1998. This recalculation resulted in an additional $21 million premium liability for the remaining operators.

Plaintiffs challenge the Trustees' application of their inception billing policy to

calculate unassigned retroactive benefit assessments.

## II.

Summary judgment is appropriate where the movant demonstrates that no genuine issue as to any material facts exists and that, based upon the undisputed facts, it is entitled to judgment as a matter of law. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). When determining a summary judgment motion, the court must view the facts in a light favorable to the nonmoving party. *Id.*

The Supreme Court has made it clear that when it "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events regardless of whether such events predate or postdate our announcement of the rule." *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97 (1993). Therefore, the Supreme Court's interpretation of the constitutionality of a federal law applies retroactively to both parties and non-parties.

## III.

All of the parties agree that the Trustees properly applied *Eastern Enterprises* retroactively to refund premiums which resulted from the assignments voided by the SSA to Eastern Enterprises and all other similarity situated companies. The sole issue is whether the Trustees should have used the inception billing process to determine liability of the remaining operators.

After *Eastern Enterprises*, the Trustees, using inception billing, retroactively

computed the liability of the remaining operators as though the Eastern beneficiaries had never been assigned. The inception billing process was not new to the Trustees. Indeed, that methodology had been used by the Trustees to remedy improper classifications of beneficiaries since the inception of the Coal Act..

Thus, Plaintiffs do not complain that Trustees adopted a new rule violative of the Act; rather they maintain that the Trustees should have discontinued the use its established methodology for improper classifications of beneficiaries. Plaintiffs cite no controlling authorities for this rather novel theory.

Plaintiffs contend that the Trustees should have obtained the full retroactive cost of implementing *Eastern Enterprises* from the AML Fund before collecting any of the retroactive cost from the remaining coal operators. But, the Coal Act and SMCRA expressly provide that the interest earned on the AML Fund is not to be used until plan year 1996. 26 U.S.C. § 9705(b); 30 U.S.C. § 1232(h). Both statutes restrict the use of the AML Fund - the amounts cannot be used to offset the costs of benefits provided prior to the commencement of plan year 1996. The Coal Act specifically provides:

> **Use of funds.** - Any amount transferred under paragraph (1) [from the AML Fund] for any fiscal year shall be used to proportionately reduce the unassigned beneficiary premium under section 9704(a)(3) of each assigned operator <u>for the plan year in which transferred</u>.

26 U.S.C. § 9705(b)(2) (emphasis added). Likewise, SMCRA states that the amount of interest which may be transferred for any fiscal year

> shall not exceed the amount of expenditures which the trustees of the Combined Fund estimate will be debited against the unassigned beneficiaries premium

9

account under section 9704(e) of title 26 <u>for the fiscal year of the Combined Fund in which the transfer is made</u>.

30 U.S.C. § 1232(h)(3)(A) (emphasis added).

The Trustees and the Court are not free to ignore these explicit statutory restrictions.

But, even if these statutory bars did not exist, the uncontroverted evidence is that the interest available from the AML Fund would be insufficient to cover the full health care premiums for the *Eastern* unassigned beneficiaries for the years 1993 through 1998.

Plaintiffs' argue in vain that the inception billing system should not have been utilized because the disassignments generated by *Eastern Enterprises* are *sui generis*.

The initial assignments constituted an unconstitutional "taking" and were therefore improper at the time they were made, regardless of what Congress intended or expected when the statute was enacted.

In conclusion, on consideration of all of the relevant undisputed facts, the Trustees are entitled to judgment as a matter of law.

By separate order, summary judgment shall be granted for Defendants.

Done this ___31st___ day of May 2001.

                                                      Chief United States District Judge
                                                      U. W. Clemon